ESTADO LIBRE ASOCIADO DE PUERTO RICO
EN EL TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PUERTO RICO HORSE OWNERS ASSOCIATION, por sí y representación de cada uno de sus socios<br>**Recurridos**<br><br>V.<br><br>CONFEDERACIÓN HÍPICA DE PUERTO RICO, por sí y en representación de sus socios; et al<br>**Recurridos**<br><br>CAMARERO RACE TRACK CORP<br>**Peticionarios** | **TA2025CE00704** | CERTIORARI procedente del Tribunal de Primera Instancia Carolina<br><br>Caso Núm.: CN2021CV00388<br><br>Sobre: Sentencia Parcial; Ley Hípica |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

Bonilla Ortiz, Juez Ponente

### **RESOLUCIÓN**

En San Juan, Puerto Rico a 26 de noviembre de 2025.

Comparece ante este foro Camarero Race Track Corp. (Camarero o "parte peticionaria") y nos solicita que revisemos una *Sentencia Parcial* emitida por el Tribunal de Primera Instancia, Sala Superior de Carolina, notificada el 22 de agosto de 2025. Mediante el referido dictamen, el foro primario declaró *Con Lugar* la *Solicitud de Sentencia Sumaria*, la *Reconvención* y la *Demanda Contra Coparte* presentada por la Confederación Hípica de Puerto Rico, Inc. (Confederación). Como consecuencia, ordenó a Camarero a pagarle a la Confederación y a sus socios, la suma de $4,978,154.00, más intereses. A su vez, le ordenó a pagar $430,920.98, más intereses, por concepto de la operación, mantenimiento y reparaciones de la Clínica Veterinaria. Asimismo, ordenó a Puerto Rico Horse Owners Association

(PRHOA) y a sus socios, a que pagaran a Camarero las sumas que esta venía obligada a pagarle a la Confederación. Finalmente, declaró *No Ha Lugar* a la *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial a Favor de PRHOA*.

Por los fundamentos que expondremos a continuación, **DESESTIMAMOS** el recurso por falta de jurisdicción, ante su presentación prematura.

## I.

El caso de autos tiene su génesis el 26 de noviembre de 2021 cuando PRHOA presentó una *Demanda* sobre enriquecimiento injusto, daños y perjuicios contra la Confederación y Camarero.[1] El 21 de enero de 2022, presentó su *Segunda Demanda Enmendada*.[2] En esencia, alegó que entre Camarero y la Confederación firmaron un contrato, el cual contiene ciertos beneficios y obligaciones entre las partes contratantes, y sobre las cuales PRHOA no es parte. Añadió que, todos los miembros de la PRHOA son dueños de caballos de carreras debidamente licenciados. Asimismo, señaló que todo dueño de caballo que no estaba afiliado a la Confederación, para efectos del contrato, se consideraban como "*Horse Owners*". Por ello, arguyó que las obligaciones contraídas entre la Confederación y Camarero de pagar a razón de cincuenta por ciento (50%) varias aportaciones indicadas en el Contrato, constituía una obligación exclusiva de las partes contratantes y en beneficio de terceros no contratantes, "*Horse Owners*". Por ello, sostuvo que no estaban obligados a pagar ninguna partida, y que tanto la Confederación, como

---

[1] *Demanda*, entrada núm. 1 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[2] *Segunda Demanda Enmendada*, entrada núm. 6 en SUMAC.

Camarero habían incurrido en un patrón para continuar deduciendo ilegalmente las partidas en concepto de cuotas que pagaban los dueños de caballos. Así pues, reclamó la cantidad aproximada de $2,300,000.00.

El 14 de septiembre de 2022, la Confederación presentó su *Contestación a la Segunda Demanda Enmendada, Reconvención y Demanda contra Coparte*.[3] Mediante la cual, negó la mayoría de las alegaciones y expuso sus defensas afirmativas, entre ellas, recalcó lo resuelto por el Tribunal Supremo de Puerto Rico en el caso *PRHOA v. Confederación Hípica*, 202 DPR 509 (2019), donde determinó que "[l]os miembros de la PRHOA no están sujetos a las obligaciones y beneficios pactados en el Contrato entre la Camarero y la Confederación."

En cuanto a su *Reconvención*, la Confederación sostuvo que, conforme a las disposiciones del Contrato, Camarero estaba obligado a distribuirle el 50% de las tarifas negociadas con el hipódromo, sobre las cuales reciben las carreras, además de pagarle el 50% de los gastos de la operación y mantenimiento de la Clínica Veterinaria. Señaló que la PRHOA al no estar sujeta a los beneficios del Contrato, no les correspondía dinero alguno de las jugadas. Añadió que, Camarero dejó de pagarle un total de $3,527,919 por concepto del "take" que se genera de las apuestas del *simulcast-in*, y se las pagó a la PRHOA. Además, le adeudaba una suma de $430,920.98 por concepto de la operación, mantenimiento y reparaciones de la Clínica Veterinaria. Por ello, solicitó el pago de lo adeudado, más daños y perjuicios.

---

[3] *Contestación a la Segunda Demanda Enmendada, Reconvención y Demanda Contra Coparte*, entrada núm. 94 en SUMAC.

El 2 de diciembre de 2022, la PRHOA presentó su *Contestación a Reconvención de la CHPR*.[4]

Luego de varios trámites procesales, el 29 de enero de 2024, Camarero presentó su *Contestación a Segunda Demanda Enmendada; Reconvención; y Demanda contra Coparte*.[5] En esta, negó la mayoría de las alegaciones y presentó sus respectivas defensas afirmativas. En específico, indicó que aportaba el cincuenta por ciento (50%) de los gastos acordados en el Contrato. A su vez, esbozó que el Contrato no contemplaba que otros posibles terceros se beneficiaran de forma gratuita. Arguyó que, la PRHOA y sus socios se habían beneficiado de sus aportaciones, por lo que, tenía una acreencia en contra de la PRHOA. Finalmente, añadió que los daños reclamados eran inexistentes.

En cuanto a la *Reconvención*, Camarero indicó que, sufrieron daños y perjuicios, toda vez que la Confederación incumplió con el Contrato. Sostuvo que, las actuaciones de PRHOA constituyeron una interferencia torticera en la relación contractual entre Camarero y la Confederación. Por ello, solicitó la suma de $2,127,651.54 por concepto de daños y perjuicios e interferencia torticera.

El 14 de febrero de 2024, PRHOA presentó una *Moción de Desestimación*.[6] En esencia, manifestó que la *Reconvención* que presentó Camarero era un intento doloso y temerario de inducir a error al foro primario, debido a que, dicho asunto había sido resuelto por el Tribunal Supremo de Puerto Rico. Añadió que, en el

---

[4] *Contestación a Reconvención de la CHPR*, entrada núm. 129 en SUMAC.
[5] *Contestación a Segunda Demanda Enmendada; Reconvención; y Demanda Contra Coparte*, entrada núm. 188 en SUMAC.
[6] *Moción de Desestimación*, entrada núm. 198 en SUMAC.

caso *PRHOA v. Confederación Hípica*, 202 DPR 509 (2019), nuestro más Alto Foro determinó que ni la PRHOA ni sus miembros eran parte del Contrato entre la Camarero y la Confederación. Por consiguiente, resaltó que procedía la desestimación de la *Reconvención* ya que no exponía una reclamación que justificara la concesión de un remedio.

En desacuerdo, el 25 de marzo de 2024, Camarero presentó su *Oposición a Moción de Desestimación*.[7] Mediante la cual, arguyó que no procedía la solicitud de desestimación, debido a que, existían controversias de hechos y de derecho por las cuales era necesario realizar un descubrimiento de prueba. Señaló que, la controversia con relación al incumplimiento de los dueños de caballos con las disposiciones del Contrato no fue parte del descubrimiento de prueba en el caso *PRHOA v. Confederación Hípica*, supra.

Así las cosas, el 10 de junio de 2024, el foro primario notificó una *Resolución*, mediante la cual declaró *Ha Lugar* la *Moción de Desestimación* presentada por PRHOA.[8] Concluyó que, las únicas partes en el *Contrato* eran Camarero y la Confederación. A su vez, que no era la primera vez que las disposiciones de dicho *Contrato* estaban siendo evaluadas por un foro judicial. Por ello, destacó que en el caso *PRHOA v. Confederación Hípica*, supra, nuestro Tribunal Supremo indicó lo siguiente:

> En el contrato entre la Confederación y Camarero sí se escribieron disposiciones con obligaciones para todos los dueños de caballos. Sin embargo, "[l]os contratos s[o]lo producen efecto entre las partes que los otorgan [...]". Art. 1209 del Código

---

[7] *Oposición a Moción de Desestimación,* entrada núm. 210 en SUMAC.
[8] *Resolución*, entrada núm. 227 en SUMAC.

Civil, 31 LPRA sec. 3374. Nadie puede "contratar a nombre de otro sin estar por este autorizado o sin que tenga por la ley su representación legal". Art. 1211 del Código Civil, 31 LPRA sec. 3376. Aunque el Art. 1209, 31 LPRA sec. 3374, contempla que se pacten estipulaciones en favor de un tercero y que este pueda exigir su cumplimiento, se requiere que antes le haga saber su aceptación al obligado. La Confederación no tiene autoridad legal para representar a los dueños de caballos no confederados. Tampoco tiene la autorización de estos.

Finalmente, el foro primario determinó que procedía la desestimación, dado que, aun aceptando como ciertos los hechos, y evaluando la prueba que surgía del expediente, no procedía la *Reconvención* presentada por Camarero.

Luego de varias incidencias procesales, el 26 de marzo de 2025, la Confederación presentó una *Solicitud de Sentencia Sumaria*.[9] En esta, reiteró el reclamo sobre que Camarero le había dejado de pagar por concepto del "*take*" que se generaba de las apuestas del *simulcast-in* y cuya partida Camarero se la pagó, y continuaba pagando, a la PRHOA. A su vez, la suma por concepto de la operación, mantenimiento y reparaciones de la Clínica Veterinaria que administra, suma que por disposición del Contrato le corresponde a la Confederación. Asimismo, señaló que el dinero devengado de las apuestas de *simulcast-in*, Camarero se lo pagó a los dueños de caballos de carreras como parte de los premios que estos reciben. No obstante, alegó que dicho dinero no forma parte de los premios. Por lo que, los pagos por concepto de *simulcast-in* que Camarero hizo a la PRHOA y a sus socios eran contrarios a la Ley Hípica. Por consiguiente, Camarero y PRHOA estaban obligados a

---

[9] *Solicitud de Sentencia Sumaria*, entrada núm. 257 en SUMAC.

pagárselos a la Confederación y a sus socios por virtud del Contrato.

El 30 de abril de 2025, Camarero presentó su *Oposición a Solicitud de Sentencia Sumaria*.[10] En esencia, arguyó que los ingresos generados del *simulcast-in*, estaban incluidos dentro de la definición de *apuestas* sujetas a la distribución pautada en la *Ley de la Industria y el Deporte Hípico de Puerto Rico*, según enmendada (*Ley Hípica*).[11] Por ello, que dicha Ley les concedía a los socios de la PRHOA y a los dueños de caballos no afiliados, el derecho a recibir los ingresos de las apuestas generadas por el *simulcast-in*. Por otra parte, señaló que el Contrato se limitaba a establecer que ellos tenían que el aportar el 50% del presupuesto de operación, mantenimiento y reparaciones de la Clínica Veterinaria. No obstante, sostuvo que en ninguna parte del Contrato exponía que tenían que entregar dicha cantidad a la Confederación. A su vez, que la Confederación no presentó como hecho incontrovertido que la PRHOA no utilizó el dinero provisto para la Clínica Veterinaria, para el fin que estaba destinado. Por ello, procedía la denegar la solicitud de sentencia sumaria de la Confederación.

---

[10] *Oposición a Solicitud de Sentencia Sumaria*, entrada núm. 263 en SUMAC.

[11] La Ley Núm. 139-2004 conocida como *Ley de la industria y el Deporte Hípico de Puerto Rico*, según enmendada, define *simulcasting* como "la transmisión simultánea de carreras que consiste en transmitir en vivo y en directo de eventos hípicos procedentes de hipódromos del extranjero para recibir apuestas sobre los mismos en Puerto Rico (*simulcast-in*). También se refiere a la transmisión simultánea de las carreras de caballos que se celebren en Puerto Rico hacia el exterior, para recibir apuestas en otro país, estado o jurisdicción, sobre éstas (*simulcast-out*)." Artículo 3 (70), 15 LPRA secc. 198b.
Por otro lado, define *apuestas* como "aquellas apuestas autorizadas por esta Ley, el Reglamento Hípico o por la Comisión de Juegos del Gobierno de Puerto Rico, mediante orden o resolución." Artículo 3 (5), 15 LPRA secc. 198b.
El Artículo 9(d) de la *Ley Hípica*, 15 LPRA sec. 198o, autoriza las apuestas realizadas en Puerto Rico sobre carreras transmitidas en "*simulcasting in*".

En la misma fecha, PRHOA presentó su *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial a Favor de PRHOA*.[12] Sostuvo que, Camarero realizó pagos de las apuestas sobre las carreras recibidas por *simulcast-in* a los dueños pertenecientes a PRHOA, así como a dueños independientes no afiliados. Sin embargo, manifestó que todavía quedaban controversias de hechos esenciales y materiales por atender, entre ellos:

> a. Si acorde al ordenamiento jurídico vigente, los pagos por concepto de *simulcast-in* deben ser exclusivamente realizados a la Confederación en perjuicio de los demás dueños de caballos *bona-fide* y contrario a la Ley Hípica, los reglamentos aplicables y a las determinaciones de la Junta Hípica hoy la Comisión.
>
> b. Si la interpretación de la Confederación sobre el *simulcast-in* a la luz del caso de *PRHOA v. CHPR,* supra, es correcta cuando el *simulcast-in* no fue parte de la controversia resuelta por el Tribunal Supremo en dicho caso.
>
> c. Si la Ley Hípica dispone los descuentos a realizarse a todas las "Apuestas" incluyendo las originadas a través de simulcast-in y su distribución a todos los dueños de caballos.
>
> d. Si el Tribunal tiene jurisdicción sobre la segunda causa de acción con las aportaciones a la Clínica Veterinaria o la jurisdicción recae en la Comisión.

Así pues, alegó que ante la ausencia de un Contrato entre Camarero y los dueños de caballos afiliados o no con la PRHOA, la distribución del dinero establecido por ley se rige por la Ley Hípica. Añadió que, el *Interstate Horseracing Act*, 15 USC sec. 301 *et. seq.*, no otorgaba derechos a la Confederación ni le impone obligaciones a Camarero en relación con las apuestas procedentes del

---

[12] *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial a Favor de PRHOA,* entrada núm. 265 en SUMAC.

*simulcast-in.* Por ello, reiteró que procedía la desestimación de la primera causa de acción, disponiendo que PRHOA y sus miembros tenían el derecho a participar en el producto de las apuestas del *simulcast-in*, independientemente de su afiliación o no a la Confederación.

El 19 de mayo de 2025, Camarero presentó *Moción en torno a Moción de Sentencia Sumaria Parcial a Favor de PRHOA*.[13] En síntesis, solicitó la desestimación de la *Reconvención* y *Demanda contra Coparte* presentada por la Confederación.

Mientras que, el 22 de mayo de 2025, la Confederación presentó su *Oposicion a Moción de Sentencia Sumaria Parcial presentada por PRHOA*.[14] En esta, reiteró que la PRHOA rechazó los beneficios del Contrato entre Camarero y la Confederación. A su vez, que la determinación del Tribunal Supremo en el caso *PRHOA vs. Confederación Hípica de Puerto Rico*, supra, resolvió que a pesar de que en el Contrato existen cláusulas a favor de tercero, los miembros de PRHOA no estaban sujetos a las obligaciones y beneficios pactados en este. Por ello, que independientemente de lo que dispone el *Interstate Horseracing Act*, supra, por disposición del Contrato entre Camarero y la Confederación, Camarero tiene la obligación de solicitarle a la Confederación su anuencia para presentar y apostar a las carreras de otras jurisdicciones en Puerto Rico. A su vez, que independientemente de si se determinaba que PRHOA no

---

[13] *Moción en torno a Moción de Sentencia Sumaria Parcial a Favor de PRHOA,* entrada núm. 267 en SUMAC.
[14] *Oposicion a Moción de Sentencia Sumaria Parcial presentada por PRHOA*, entrada núm. 269 en SUMAC.

debía pagarles el dinero que Camarero le había pagado erróneamente, por disposición del Contrato, Camarero estaba obligado a pagarles el 50% del "*Take*" que se genera del *simulcast-in*. Finalmente, sostuvo que el foro primario tenía jurisdicción para atender la controversia sobre la Clínica Veterinaria.

Evaluadas las mociones, el 22 de agosto de 2025, el foro primario notificó la *Sentencia Parcial* recurrida.[15] En la cual declaró *Con Lugar* la *Solicitud de Sentencia Sumaria*, *Reconvención* y *Demanda Contra Coparte* presentada por la Confederación. Por consiguiente, declaró *No Ha Lugar* la *Oposicion a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial a favor de la PRHOA*. Dicha determinación, fue tomada en base a las siguientes determinaciones de hechos:

1. Puerto Rico Horse Owners Association (PRHOA) es una corporación sin fines de lucro debidamente organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, la cual agrupa a un número menor de dueños de caballos licenciados por la Comisión de Juegos del Gobierno de Puerto Rico.

2. La codemandada Confederación Hípica de Puerto Rico, Inc. (Confederación), es una corporación sin fines de lucro organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico la cual agrupa a la mayoría de los dueños de caballos de carreras licenciados por la Comisión de Juegos del Gobierno de Puerto Rico. Los socios de la Confederación son personas naturales o jurídicas a quienes el Negociado Hípico les ha expedido licencia de dueños de caballos.

3. La codemandada Camarero Race Track Corp. (Camarero), es una corporación constituida al amparo de las leyes del Estado Libre Asociado de Puerto Rico. Camarero posee licencia para operar el hipódromo debidamente expedida por la Administración de la Industria y del Deporte Hípico (AIDH), hoy en día Comisión de Juegos del Gobierno de Puerto Rico.

---

[15] *Sentencia Parcial,* entrada núm. 277 en SUMAC.

4. La industria y el deporte hípico en Puerto Rico están altamente regulados por el estado. Los dueños de caballos purasangre para poder participar en el Deporte Hípico y su industria deben estar debidamente licenciados por la Administración de la Industria y el Deporte Hípico (AIDH) y bajo las disposiciones de la "Ley de la Comisión de Juegos del Gobierno de Puerto Rico", Ley 81 de 2019. La referida actividad hípica está regulada por la Comisión de Juegos del Gobierno de Puerto Rico.

5. PRHOA fue creada el 29 de enero de 2013.

6. Camarero Race Track Corp., es la empresa que fue licenciada por la Junta Hípica para operar el Hipódromo Camarero, localizado en Canóvanas, Puerto Rico.

7. La Confederación Hípica de Puerto Rico, Inc. es una corporación sin fines de lucro la cual agrupa a la mayoría de los dueños de caballos de carreras licenciados por la Comisión de Juegos del Gobierno de Puerto Rico.

8. El 23 de enero de 2007 Camarero y la Confederación firmaron un Contrato que rige la relación entre la empresa operadora del hipódromo y la Confederación y sus socios.

9. El Contrato dispone en su párrafo "FOUR" lo siguiente:

"The Confederación states that it appears as the representative of not less than Two Thirds (2/3) of all the owners of racehorses in Puerto Rico presently licensed as such, which race at Hipódromo Camarero, and that it enters into this Contract on its own behalf and on behalf of each of said individual horse owners. CAMARERO agrees, that as long as this contract shall be in force, and The Confederación continues to represent no less than two thirds (2/3) of all horse owners, it will recognize Confederación as the exclusive agent and representative of said horse owners for the negotiation of any problems common to all majority of the horse owners at Hipódromo Camarero."

10. El Contrato dispone en su cláusula "FIVE" que el mismo será efectivo desde el 5 de enero de 2007 y expira el 31 de diciembre de 2010.

11. En el segundo párrafo de la cláusula "FORTY" del Contrato se establece que:

"Upon the termination of this contract, if a new contract has not been agreed to and duly executed by the parties, then this contract will continue to be in full force and be binding to CAMARERO and The Confederación until a new contract is negotiated, agreed to and executed."

12. El párrafo "EIGHT" del Contrato dispone lo siguiente sobre la Clínica Veterinaria: "The Confederación and CAMARERO agree to fund the annual Budget for the operation, maintenance and repair of the veterinary clinic on a 50/50 basis for the duration of this contract. The Confederación and CAMARERO herein establish the amount of $457,156.00 as the "Base Year Budget" detailed in Exhibit A. This amount will serve as a minimum for the parties to establish future annual budgets throughout the life of this contract…"

13. En el párrafo "TWENTY" del Contrato se provee lo siguiente sobre el *simulcast-in*:

"… If at any moment in the future CAMARERO and The Confederación decide that receiving simulcast races from tracks outside of Puerto Rico is convenient and/or of benefit for them, they will together request permission from the Racing Board to approved said simulcasting. In such cases, CAMARERO will pay to the Confederación/Horse Owners, as purses, 50% of the "Take" after the negotiated Host Simulcast Fee has been deducted for the Host Track where the race was actually raced. No satellite cost will in any way be allocated to Confederación."

14. Para el mes de enero de 2013, varios miembros de la Confederación se desafiliaron y el 29 de enero de 2013 crearon la PRHOA.

15. El 21 de marzo de 2014, PRHOA presentó ante la Junta Hípica una Moción en Oposición a "*Nonsuit*" en el caso núm. JH-13-61, en el que PRHOA reclamó el dinero que aportaba a la Clínica Veterinaria. En el párrafo 35 de la Moción en Oposición a "*Nonsuit*" PRHOA expuso que:

"35. Surge de esta discusión que las deducciones que se le hacen a PRHOA son inválidas, ya que PRHOA no prestó su consentimiento para que se le aplicara el contrato. De igual manera, PRHOA no ha autorizado a la Confederación para que suscriba un contrato a su nombre. Además, según se está aplicando este contrato en donde se le retiene dinero a PRHOA para

entregárselo a la Confederación, resulta en un daño a un tercero que no es parte: PRHOA."

16. Desde la creación de PRHOA el 29 de enero de 2013 al presente, Camarero le ha estado pagando a PRHOA una parte del "*take*" de las apuestas a *simulcast-in*.

17. Desde el 29 de enero de 2013 al mes de febrero de 2025, Camarero le ha pagado a PRHOA y a sus socios por concepto del "*take*" que se genera de las apuestas del simulcast-in la suma de $4,864,680.00.

18. Que conforme se sigan recibiendo apuestas en Puerto Rico por las carreras que se transmitan de otros países (si*mulcast-in*), la suma por concepto del "*take*" que se genera de las apuestas del *simulcast-in* aumentará.

19. Camarero le descontó a la Confederación y a sus socios por concepto de la operación, mantenimiento y reparaciones de la clínica veterinaria la suma de $430,920.98, la cual, a su vez, Camarero se la pagó a PRHOA.

20. El 6 de septiembre de 2021 Camarero le cursó una carta de cobro a PRHOA en la que le reclamó el pago de la suma de $375,020.49 que le fueron entregados a PRHOA como aportación a la Clínica Veterinaria.

21. El 2 de noviembre de 2022 Camarero le cursó una carta de cobro a PRHOA en la que le reclamó el pago de la suma de $375,020.49 que le fueron entregados a PRHOA como aportación a la Clínica Veterinaria.

En virtud de las determinaciones de hechos, el foro recurrido concluyó que PRHOA y sus socios no tenían derecho a recibir los beneficios que se generan del *simulcast-in*. Por lo que, Camarero debía pagarle a la Confederación y a sus socios la suma reclamada de $4,978,154.00, más los intereses que generara dicha suma hasta su total y completo pago, por concepto de *simulcast-in*. De igual forma, PRHOA y sus socios debían devolverle a Camarero la suma de $4,978,154.00, los cuales habían recibido por parte de Camarero por concepto de *simulcast-in*.

En cuanto a la controversia sobre la Clínica Veterinaria, el foro de instancia determinó que Camarero le pagó a PRHOA un dinero que no le correspondía por concepto de la operación, mantenimiento y reparaciones de la Clínica Veterinaria. Por consiguiente, Camarero debía pagarle a la Confederación y a sus socios la suma reclamada de $430,920.98, más los intereses. De igual forma PRHOA y sus socios debían devolverle a Camarero la suma de $430,920.98 que recibieron por parte de Camarero por concepto de *simulcast-in*.

En desacuerdo, el 8 de septiembre de 2025, Camarero presentó una *Moción de Reconsideración*.[16] De igual forma, PRHOA presentó una *Moción de Reconsideración y de Enmiendas o Determinaciones Iniciales o Adicionales*.[17]

En la misma fecha, el foro primario notificó varias órdenes, en la cual solicitó a las partes a que se expresaran en o antes del 29 de septiembre de 2025, sobre las mociones de reconsideración instadas por Camarero y la PRHOA.[18]

El 29 de septiembre de 2025, Camarero presentó su *Posición en Torno a Reconsideración de Sentencia Parcial presentada por PRHOA*.[19]

En la misma fecha, la PRHOA presentó una *Réplica a Reconsideración presentada por Camarero Race Tract Corp*.[20]

---

[16] *Moción de Reconsideración*, entrada núm. 277 en SUMAC.
[17] *Moción de Reconsideración y de Enmiendas o Determinaciones Iniciales o Adicionales*, entrada núm. 279 en SUMAC.
[18] *Orden*, entrada núm. 278 y *Orden*, entrada núm. 280 en SUMAC.
[19] *Posición en Torno a Reconsideración de Sentencia Parcial presentada por PRHOA*, entrada núm. 283 en SUMAC.
[20] *Réplica a Reconsideración presentada por Camarero Race Tract Corp*, entrada núm. 284 en SUMAC.

El 1 de octubre de 2025, el foro primario notificó una *Orden*, en la cual declaró *No Ha Lugar* la reconsideración.[21]

El 2 de octubre de 2025, la PRHOA presentó una *Moción Solicitado Aclaración de Orden*.[22] En esta, solicitó que el foro recurrido aclarara la *Orden* emitida sobre la denegatoria de una moción de reconsideración, debido a que, había dos mociones de reconsideración pendientes. A su vez, que faltaba la posición de la Confederación sobre dichas mociones de reconsideración.

El 3 de octubre de 2025, el foro primario notificó una *Orden,* en la cual indicó lo siguiente:[23]

> Analizando el expediente tiene la PRHOA la razón en torno a que falta una parte por exponer su posición. Dejamos sin efecto nuestra Orden de la entrada núm. 285. Tan pronto la parte que falta exprese su posición el Tribunal estará evaluando nuevamente los escritos.

En la misma fecha, la Confederación presentó su *Réplica a Mociones de Reconsideración*.[24]

El 6 de octubre de 2025, el foro primario notificó una *Orden*, mediante la cual indicó que estaría evaluando las posición de las partes y emitiendo una determinación por escrito.[25]

Inconforme, el 31 de octubre de 2025, Camarero presentó el recurso de epígrafe, mediante el cual planteó los siguientes señalamientos de error:

> 1. Erró el TPI en su interpretación de Ley Hípica al concluir que los miembros de PRHOA no tienen derecho a las ganancias de las apuestas generadas por el simulcast-in porque no son premios.
>
> 2. Erró el TPI en su interpretación de Ley Hípica al concluir que es necesario aplicar

---

[21] *Orden*, entrada núm. 285 en SUMAC.
[22] *Moción Solicitado Aclaración de Orden*, entrada núm. 286 en SUMAC.
[23] *Orden*, entrada núm. 287 en SUMAC.
[24] *Réplica a Mociones de Reconsideración*, entrada núm. 290 en SUMAC.
[25] *Orden*, entrada núm. 290 en SUMAC.

los términos del Contrato suscrito entre la Confederación y Camarero para establecer si tienen derecho al ingreso que genera el simulcast-in.

3. En la alternativa, erró el TPI al concluir que no existe controversia de hechos respecto a si, con excepción de las obligaciones y beneficios referentes a la clínica veterinaria, PRHOA aceptó las restantes obligaciones y beneficios en el Contrato suscrito entre Confederación y Camarero.

4. Erró el TPI al concluir que no existe controversia de hechos con relación a los montos que la Confederación alegan se les adeuda por el simulcast-in.

5. Erró el TPI al concluir en su interpretación de la cláusula ocho del Contrato al concluir que Camarero tiene que pagarle directamente a la Confederación el 50% del presupuesto de la Clínica Veterinaria.

6. Erró el TPI el concluir que la Confederación probó que Camarero no cumplió con su obligación contractual de aportar el 50% del presupuesto de la Clínica Veterinaria.

7. Erró el TPI al asumir jurisdicción sobre la reclamación relacionada a la clínica veterinaria y conceder pagos a la Confederación por gastos de la clínica veterinaria, a pesar de que un caso asociado dirigió este asunto a la jurisdicción de la actual Comisión de Juegos.

8. Erró el TPI al concluir que la prueba presentada por la Confederación como prueba anejada a la solicitud de sentencia sumaria en relación a los montos se alega se adeudan por la clínica veterinaria cumple con las normas de nuestro ordenamiento jurídico y es admisible.

El 3 de noviembre de 2025, emitimos una *Resolución*, en la cual le concedimos a la parte recurrida, el término de quince (15) días contados a partir de la fecha de presentación del recurso, para que se expresara sobre el recurso de epígrafe.

El 5 de noviembre de 2025, la Confederación presentó una *Solicitud de Desestimación*. Mediante la cual, señaló que las mociones de reconsideración

presentadas por Camarero y la PRHOA están pendientes de resolución ante el foro primario.

El 7 de noviembre de 2025, emitimos una *Resolución* en la cual le concedimos un término de cinco (5) días a la parte peticionaria para que se expresara sobre la moción de desestimación.

En la misma fecha, Camarero presentó una *Moción Informativa*, indicando que la PRHOA presentó una *Demanda* ante el Tribunal Federal para el Distrito de Puerto Rico contra Camarero, su presidente Ervin Rodríguez, la Confederación y su presidente, Rafael Matos, entre otros.

En cumplimiento con nuestra *Resolución*, el 12 de noviembre de 2025, Camarero presentó su *Oposicion a Solicitud de Desestimación*. Mediante la cual, señaló que el foro primario atendió las mociones de reconsideración el 1 de octubre de 2025, siendo denegadas, no obstante, el 3 de octubre de 2025, dejó sin efecto dicha orden, para evaluar los mismos escritos sin emitir determinación final. Por ello, dentro del término para recurrir presentó el recurso de epígrafe.

El 14 de noviembre de 2025, la Confederación presentó una *Solicitud de Prórroga*. No obstante, el 17 de noviembre de 2025, notificamos una *Resolución* en la cual la denegamos.

Así las cosas, el 17 de noviembre de 2025, la Confederación presentó su *Oposicion a Certiorari*.

Con el beneficio de la comparecencia de las partes, procedemos a atender el recurso.

**II.**

**-A-**

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023); *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 846-847 (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021*); Pueblo v. Rivera Montalvo,* 205 DPR 352, 372 (2020); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 728-729 (2016); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *Pueblo v. Díaz de León*, 176 DPR 913, 917 (2009). No obstante, tal "discreción no opera en lo abstracto. A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, dispone los criterios que dicho foro deberá considerar, de manera que pueda ejercer sabia y prudentemente su decisión de atender o no las controversias que le son planteadas." *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008); *Pueblo v. Rivera Montalvo*, supra, pág. 372; Torres *González v. Zaragoza Meléndez*, supra, pág. 848. La precitada Regla establece lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación

de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

No obstante, "ninguno de los criterios antes expuestos en la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, es determinante, por sí solo, para este ejercicio de jurisdicción, y no constituye una lista exhaustiva." *García v. Padró*, 165 DPR 324, 327 (2005). Por ello, de los criterios antes expuesto "se deduce que el foro apelativo intermedio evaluará tanto la corrección de la decisión recurrida, así como la etapa del procedimiento en que es presentada; esto, para determinar si es la más apropiada para intervenir y no ocasionar un fraccionamiento indebido o una dilación injustificada del litigio." *Torres Martínez v. Torres Ghigliotty*, supra, pág. 97.

De otro lado, la Regla 52.1 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V. R. 52.1, establece lo siguiente:

> El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el

Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

[…].

Según se desprende de la precitada Regla, este foro apelativo intermedio podrá revisar órdenes interlocutorias discrecionalmente, cuando se recurre de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía o en casos de relaciones de familia o que revistan interés público, o en aquellas circunstancias en las que revisar el dictamen evitaría un irremediable fracaso de la justicia, entre otras excepciones.

El *certiorari*, como recurso extraordinario discrecional, debe ser utilizado con cautela y solamente por razones de peso. *Pérez v. Tribunal de Distrito*, 69 DPR 4, 7 (1948). Procede cuando no está disponible la apelación u otro recurso que proteja eficaz y rápidamente los derechos del peticionario. *Pueblo v. Tribunal Superior*, 81 DPR 763, 767 (1960). El Tribunal Supremo de Puerto Rico ha expresado también que "de ordinario, el Tribunal Apelativo no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o

aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial." *Zorniak Air Servs. V. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992); *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

–B–

El Tribunal Supremo de Puerto Rico ha definido la jurisdicción como el poder que ostentan los tribunales para considerar y decidir los casos y las controversias que sean presentados a su atención. *Miranda Corrada v. DDEC et al.*, 211 DPR 738, 745 (2023); *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 101 (2020); *Torres Alvarado v Madera Atiles,* 202 DPR 495, 499-500 (2019); *Solá-Moreno v. Bengoa Becerra*, 182 DPR 675, 682 (2011). Es normativa reiterada que, los tribunales debemos ser celosos guardianes de nuestra jurisdicción, es por lo que, los asuntos relativos a la jurisdicción son privilegiados y deben ser atendidos con prontitud. *Miranda Corrada v. DDEC et al.*, supra; *Báez Figueroa v. Adm. Corrección,* 209 DPR 288, 298 (2022*) Torres Alvarado v. Madera Atiles,* supra, pág. 500*; González v. Mayagüez Resort & Casino*, 176 DPR 848, 856 (2009). La ausencia de jurisdicción puede ser levantada *motu proprio*, ya que, esta incide de forma directa sobre el poder del tribunal para adjudicar una controversia. *Allied Mgtm. Group. v. Oriental Bank,* 204 DPR 374, 386 (2020)*; Torres Alvarado v Madera Atiles*, supra; *Ruiz Camilo v. Trafon Group Inc.*, 200 DPR 254, 268 (2018*); Souffront v. AAA*, 164 DPR 663, 674 (2005).

Por consiguiente, un tribunal no tiene discreción para asumir jurisdicción donde no la hay, si carece de jurisdicción, deberá así declararlo y desestimar la

reclamación sin entrar en sus méritos, pues la falta de jurisdicción no es susceptible de ser subsanada. *Yumac Home v. Empresas Massó*, 194 DPR 96, 107 (2015); *Mun. De San Sebastián v. QMC Telecom,* 190 DPR 652, 600 (2014); *Souffront v. AAA,* supra; *Cobra Acquisitions v. Mun. Yabucoa et al.,* 210 DPR 384, 394-395 (2022).

Cónsono con lo anterior, la Regla 83 del Reglamento del Tribunal de Apelaciones, según enmendadas, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 42, confiere facultad a este Tribunal para a iniciativa propia o a petición de una parte, desestimar un recurso de apelación o denegar un auto discrecional cuando este foro carece de jurisdicción.

-C-

La Regla 52.2(b) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 52.2(b) establece que, los recursos de *certiorari* ante el Tribunal de Apelaciones para revisar resoluciones u órdenes interlocutorias, deberán presentarse dentro del término de treinta (30) días desde la fecha de notificación de la resolución u orden. *AFI v. Carrión Marrero y otros,* 209 DPR 1, 5 (2022). De igual forma, la referida regla dispone múltiples instancias en las que el aludido término puede ser interrumpido. En lo pertinente, la Regla 52.2(g), 32 LPRA Ap. V, R. 52.2(g), indica lo siguiente:

> (g) Interrupción del término para presentar una solicitud de *certiorari* ante el Tribunal de Apelaciones. El transcurso del término para presentar ante el Tribunal de Apelaciones una solicitud de *certiorari* se interrumpirá y comenzará a contarse de nuevo en conformidad con lo dispuesto en la Regla 47.

En ese sentido, la Regla 47 de Procedimiento Civil, 32 LPRA, Ap. V, R. 47, dispone como sigue:

Regla 47. Reconsideración

La parte adversamente afectada por una orden o resolución del Tribunal de Primera Instancia podrá presentar, dentro del término de cumplimiento estricto de quince (15) días desde la fecha de la notificación de la orden o resolución, una moción de reconsideración de la orden o resolución.

La parte adversamente afectada por una sentencia del Tribunal de Primera Instancia podrá presentar, dentro del término jurisdiccional de quince (15) días desde la fecha de archivo en autos de copia de la notificación de la sentencia, una moción de reconsideración de la sentencia.

[…]

Una vez presentada la moción de reconsideración quedarán interrumpidos los términos para recurrir en alzada para todas las partes. Estos términos comenzarán a correr nuevamente desde la fecha en que se archiva en autos copia de la notificación de la resolución resolviendo la moción de reconsideración.

[…].

Tal solicitud debe exponer con suficiente particularidad y especificidad los hechos y el derecho que el promovente estima que deben reconsiderarse. Regla 47 de Procedimiento Civil, *supra*. Si el foro primario acoge la moción y emite una nueva determinación que es sustancialmente distinta a la original, cualquiera de las partes del pleito puede solicitar que se reconsidere el nuevo dictamen. *Colón Burgos v. Marrero Rodríguez*, 201 DPR 330 (2018). No obstante, para que la nueva solicitud de reconsideración interrumpa el término estricto de treinta (30) días para recurrir al foro apelativo, la moción debe indicar cuáles son las alteraciones sustanciales cuya reconsideración se solicita por primera vez. *Íd*. Véase, también, Regla 52.2 de Procedimiento Civil, *supra*.

Por último, mientras exista una determinación pendiente ante la consideración del tribunal de instancia, cualquier recurso presentado ante el foro apelativo será prematuro. *Yumac Home v. Empresas Massó*, 194 DPR 96 (2015). Del foro recurrido resolver la controversia pendiente, la parte solicitante podrá recurrir nuevamente ante este Foro Apelativo. *Íd*.

### III.

En el caso de autos, la parte peticionaria nos solicita que revisemos la *Sentencia Parcial* emitida por foro primario el 22 de agosto de 2025. Mediante la cual, declaró *Con Lugar* la *Solicitud de Sentencia Sumaria*, la *Reconvención* y la *Demanda Contra Coparte* presentada por la Confederación. No obstante, debemos atender un asunto de índole jurisdiccional que amerita nuestra atención con prioridad.

Conforme surge del expediente, el 22 de agosto de 2025, el foro primario notificó la determinación recurrida. En desacuerdo, el 8 de septiembre de 2025, Camarero y PRHOA presentaron sus respectivas mociones de reconsideración. Mientras que, el 11 de septiembre de 2025, la Confederación solicitó una prórroga para presentar su réplica a las reconsideraciones. El 12 de septiembre de 2025, el foro primario le concedió a la Confederación hasta el 3 de octubre de 2025. El 29 de septiembre de 2025, Camarero y la PRHOA presentaron sus réplicas.

Así las cosas, el 1 de octubre de 2025, el foro primario notificó una *Orden* en la cual indicó lo siguiente: "[a]tendidos los planteamientos de las partes declaramos No Ha Lugar la Reconsideración presentada."

Sin embargo, el 2 de octubre de 2025, la PRHOA presentó una *Moción Solicitando Aclaración de Orden*. En esta, solicitó que el foro recurrido aclarara la *Orden* sobre la denegatoria de una moción de reconsideración, debido a que, tenía dos mociones de reconsideración pendientes. A su vez, que faltaba la posición de la Confederación sobre dichas mociones de reconsideración.

El 3 de octubre de 2025, el foro primario notificó una *Orden,* en la cual manifestó lo siguiente:[26]

> Analizando el expediente tiene la PRHOA la razón en torno a que falta una parte por exponer su posición. Dejamos sin efecto nuestra Orden de la entrada núm. 285. Tan pronto la parte que falta exprese su posición el Tribunal estará evaluando nuevamente los escritos.

En la misma fecha, la Confederación presentó su *Réplica a Mociones de Reconsideración*.[27]

El 6 de octubre de 2025, el foro primario notificó una *Orden*, mediante la cual indicó que estaría evaluando las posiciones de las partes y emitiendo una determinación por escrito.[28]

Luego de examinar el tracto procesal, nos resulta evidente que el foro primario no ha resuelto adecuadamente las mociones de reconsideración. A pesar de que, había emitido una *Orden* denegando una moción de reconsideración, en esta no indicó cuál de las dos mociones que tenía pendiente había denegado.

Por consiguiente, concluimos que hasta tanto el foro primario no adjudique las dos mociones de reconsideración ante su consideración, los términos para recurrir ante este Foro no habrán de comenzar a decursar. *Colón Burgos v. Marrero Rodríguez*, 201 DPR 330 (2018);

---

[26] *Orden*, entrada núm. 287 en SUMAC.
[27] *Réplica a Mociones de Reconsideración*, entrada núm. 290 en SUMAC.
[28] *Orden*, entrada núm. 290 en SUMAC.

*Mun. Rincón v. Velázquez Muñiz y otros*, 192 DPR 989 (2015).

Por tanto, ante un recurso de *certiorari* prematuro, carecemos de la jurisdicción o autoridad para evaluar el recurso ante nos en sus méritos. Lo anterior, por cuanto su presentación carece de eficacia y no produce efecto jurídico alguno, ya que en ese momento todavía no ha nacido autoridad judicial para acogerlo. *Torres Alvarado v. Madera Atiles*, supra, pág. 501.

### IV.

Por los fundamentos antes expuestos, **DESESTIMAMOS** el recurso de epígrafe, por falta de jurisdicción ante su presentación prematura.

Lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones